ANTONIA RAMOS BUIST, ETC., ET AL., Plaintiffs, Appellees and Appellants, *v.* HEIRS OF LUIS LLORÉNS TORRES, ETC., ET AL., Defendants, Appellants and Appellees.

Nos. 289 and 290.    Decided June 1, 1965.

*Héctor Ramos Mimoso, Gabriel de la Haba, Juan A. Faría,* and *Nicolás Jiménez Torres* for plaintiffs, appellees and appellants. *Rodríguez Ema & Rodríguez Ramón* for intervener Manuel H. Rossy. *Brown, Newsom & Córdova, Otero Suro & Otero Suro* for the Heirs of Luis Lloréns Torres. *Luis Blanco Lugo, Luis F. Cuyar* and *Jorge Souss* for Felipe Segarra and Amelia Boerman.

Division composed of Mr. Acting Chief Justice Pérez Pimentel, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

The controversy in litigation has its origin in facts which occurred on October 29, 1919.

1) The record tells us that on that day, and by deed No. 42 executed in San Juan before Notary Luis Abella-Blanco, Clemencia and Antonia Ramos-Buist and their brothers Jesús and León, sold to Luis Lloréns-Torres a rural property which was described therein as follows:

"Rural Property: Known as Monte Rey, situated in the ward of Monacillos of the Municipal District of Río Piedras. Its area is approximately two hundred twenty cuerdas, consisting of plain, swampy and mangrove lands, equivalent to eighty-six hectares, forty-six ares, and eighty-six centiares. And its boundaries are the following: On the North by the Río Piedras River, also called Puerto Nuevo; on the West by the segregated parcel belonging at present to Luis Rubert-Cátala; on the South by the said lands of Rubert and the property formerly owned by the Heirs of Ramón Gutiérrez del Arroyo and at present by José S. Cestero; and on the West by Margarita Brook and the property of the Iriarte brothers, formerly owned by Presbyter Ma-

nuel Díaz-Caneja. The said property contains a shed, a limekiln and some shacks for peons. Part of. it is devoted at present to sugarcane and some to pasture. It is crossed from north to south, along the entire length from the bridge of Puerto Nuevo River to Margarita Brook, by the insular highway leading from Cerra Street, of Santurce, to Bayamón. All of its land is completely flat with the exception of the hill known by the name of Monte or Seboruco del Rey."

The conveyance was made for the price of $10,000 which was paid at the execution of the deed, and it was set forth that the sale was for a lump sum and not for so much per unit of measure or number, wherefore the vendee would have no right to make any claim in the event that, for any reason, the area of the real property sold is found to be smaller, nor would the sale be affected by the greater or smaller area of the real property, regardless of the greater or lesser importance of the resulting increase or diminution.

2) The same day the deed was executed, October 29, 1919, the vendors Ramos-Buist, the vendee Luis Lorréns-Torres, and the attorney, Manuel F. Rossy, executed a private instrument subscribed before the same Notary Abella-Blanco, affidavit No. 1172, which is the object of the suit and which we turn to copy:

### "PRIVATE AGREEMENT

"The contracting parties in the present private agreement are Luis Lloréns Torres, assisted by his wife Carmen Rivero Rodríguez, parties of the first part; and the attorney, Manuel F. Rossy, and the Ramos Buist brothers and sisters named León, Jesús, Antonia and Clemencia, parties of the second part, who stipulate the following commitment:

"1. That the undersigned Lloréns-Rivero spouses are the owners of the property known as Monte Rey, consisting of two hundred twenty cuerdas, situated in the ward of Monacillos of Río Piedras, and that in the north of the said property there is a piece of mangrove land which The People of Puerto Rico seeks to claim from them without any reason whatever.

"2. That the undersigned Ramos-Buist brothers and sisters and Mr. Rossy agree to help Lloréns Torres by giving him all the cooperation necessary for the defense of the actions sought to be filed by The People of Puerto Rico; it being understood that Mr. Rossy's help shall be as attorney at law and counsellor, while the cooperation of the Ramos-Buist brothers and sisters has consisted only in furnishing to LLORÉNS–TORRES all the antecedents and data necessary for their defense, Mr. Lloréns confessing that such antecedents and data have been furnished to him by the undersigned Ramos-Buist brothers and sisters.

"3. In consideration of such help or cooperation of Mr. Rossy and of the Ramos-Buist brothers and sisters, Mr. Lloréns, if he prevails in the actions by The People of Puerto Rico, hereby agrees *to sell or convey to the other appearing parties* one-half of the said mangrove lands which may be the object of such claims, it being set forth herein that the part of the mangrove land to which this contract refers is situated on the north of the real property, in the space or perimeter comprised between the Puerto Nuevo River, the Barraco Brook, the Seboruco del Rey, and the old channel of Margarita Brook, fixing as price for such sale the sum of ONE THOUSAND DOLLARS which the contracting parties consider is the fair value of such help or cooperation, for which amount Lloréns, assisted by his wife, will sign the corresponding deed of sale in favor of the others undersigned in the proportion of one-sixth for the attorney, Mr. Rossy, and the other five-sixths for the four Ramos-Buist brothers and sisters. It is repeated here that said obligation to sell on the part of the Lloréns-Rivero spouses is only in the event that, by compromise or by judgment, the said claims of The People of Puerto Rico are successful, that is, in the defense against them; and it is also repeated that this agreement only refers to the said mangrove lands object of such claims.

"4. It is further stipulated that Mr. Lloréns shall have at all times preference, in the event of sale or lease by the other contracting parties, over the one-half corresponding to them.

"5. Mr. Lloréns also recognizes that the wood of the shed and annexed small houses belongs to León-Ramos.

"They execute this agreement in pursuance of the terms thereof binding themselves to perform the same, signing the same in duplicate in San Juan on this 29th day of October 1919.

Carmen R. de Lloréns—Manuel F. Rossy—L. Ramos—Antonia R. Widow of Álvarez-Torres—Jesús Ramos-Buist—Luis Lloréns-Torres—C. R. Widow of Buist.

"Affidavit No. 1172. Subscribed to before me in San Juan, Puerto Rico, this 29th day of October 1919, by the following persons: Luis Lloréns-Torres and his wife Carmen Rivero, both of whom are of full age, property owners and residents of San Juan; Manuel F. Rossy and Antonia Ramos, of full age, widowed, property owners and residents hereof; and Clemencia Ramos, widow, and León and Jesús Ramos-Buist, of full age, property owners and residents of Bayamón, the latter two being married, all of whom, I attest, are known to me personally.— L. Abella-Blanco—Notary Public."

3) As antecedents of the transactions of October 29, 1919, the record shows, as it appears from deed of division No. 32 executed in San Juan on September 27, 1919, before Notary Luis Abella-Blanco by the Ramos-Buist brothers and sisters and Luis Rubert, that Antonio Ramos-Mencos was the owner since 1854, by inheritance from his father, of the property known as "San Patricio." It appears from the instrument and from the Registry that in 1881 Antonio Ramos filed in the court of Río Piedras a dominion title proceeding which was recorded, assigning to the "San Patricio" property an area of about 760 cuerdas. In 1893 Antonio Ramos sold to Leopoldo Cerecedo 680 cuerdas which afterwards became the property of Luis Rubert, reserving the part situated on the northeast of the property which he calculated at 80 cuerdas and which was in litigation with Father Díaz Canejo. It is said in the deed of division that a survey was made thereafter and the "San Patricio" property was assigned an area of about 900 cuerdas which were recorded in the Registry; and it is also said that The People of Puerto Rico was claiming some mangrove lands, without stating their area or location, and that if for such reason or for any other the total area of the main property was found to be smaller, the loss could not affect the segregated parcel of 680 cuerdas

of Rubert, but that it would be imputed to, and would affect only, the remaining parcel of the Ramos brothers and sisters who had inherited the same from their father on January 14, 1894. The increase of area from 760 to 900 cuerdas—140 cuerdas—was fully credited to the portion reserved by Antonio Ramos, thereby increasing such portion from 80 to 220 cuerdas which were described as the "Monte Rey" property in the said deed of division No. 32 with the metes and bounds with which the said property is described in the instrument of sale to Lloréns-Torres, paragraph (1) above. It is stated in the deed of division that the price assigned to Rubert's 680 cuerdas was the rate of $44.11-1/2 per cuerda, and a total value of $9,800 (at the rate of $44.54 per cuerda) to the "Monte Rey" parcel of the Ramos, which was the sum agreed upon for the conveyance to Lloréns.

4) Also as antecedents of the transactions of October 29, the Ramos brothers and sisters, Lloréns and Rossy had agreed in writing, in an instrument dated July 27, 1919, that Lloréns was buying the Monacillo property at the rate of $200 per cuerda of whatever appeared to be the number of cuerdas from a survey to be made at this time, and that Lloréns-Torres and Rossy would procure from the Insular Administration the obtainment of the mangrove lands lying to the northeast of the property along the seashore, and that the amount of land obtained thereby would be divided between vendee Lloréns and the vendors. The vendors would procure the execution of a judgment obtained against Father Díaz Caneja in order to restore the boundary of the property sold to the true course of the Margarita Brook, and the land obtained by such execution would be sold to Lloréns at the same price of $200 per cuerda.

5) On April 16, 1920, The People of Puerto Rico filed an action of revendication against Luis Lloréns-Torres, civil case No. 12,685 of the former District Court of San Juan, claiming the dominion of a parcel having an approximate

area of 300 cuerdas of mangrove land which was accessible to the high tides. In his answer Lloréns alleged, among other things, that the "San Patricio" property had within its metes and bounds an area of 1,077 cuerdas, and that when the 680 cuerdas sold to Rubert were segregated the remainder acquired by him contained 397 cuerdas, according to the blueprints of the survey set up by engineer Antolín Nin in March 1920 which he attached to his answer. He alleged that his Monte Rey property was not bounded at any place by mangrove lands of The People of Puerto Rico, and that its northern boundary was the Puerto Nuevo River and on the west the Margarita Brook which divided the Municipality of Río Piedras from that of Guaynabo, and that that brook flowed into the Puerto Nuevo River at about 150 meters from its mouth.

6) The action was decided on February 13, 1925. The court concluded from the entire documentary and oral evidence and from the inspection made that the northern boundary of Lloréns' property was the Puerto Nuevo River only as far as the point where it flows into the San Juan Bay, and from there on the boundary was the mangrove zone of The People of Puerto Rico within which the portion of land claimed was included, the dividing line being the highest line marked by the waters of the rising and receding tide, and that, this being so, Lloréns' title did not comprise that portion.

7) An appeal having been taken from the foregoing judgment, case 3924 of this Court, and it having been abandoned on February 12, 1931, on the same date the parties submitted a compromise to the court of first instance whereby, and in accordance with the terms thereof, another judgment was rendered on February 18, 1931, setting aside the former and decreeing that The People of Puerto Rico accepted that Lloréns was the legitimate owner of the 220 cuerdas recorded in the Registry, according to the verified chain of

title since 1815.[1] The judgment situated the said 220 cuerdas from Verraco Brook, by the furthest end which separates them from Rubert's portion, up to a straight line parallel to the insular highway running from Margarita Brook as far as the Puerto Nuevo River, to be laid out by engineers of the Department of the Interior, and from this line the remaining land on the east thereof as far as the San Juan Bay was the property of The People of Puerto Rico; and that that line would be the definitive boundary for the parties and their successors between the lands of The People and the San Patricio and Monte Rey properties. It was decreed that The People of Puerto Rico was the owner of all the excess land situated between the 220 cuerdas so demarcated and the San Juan Bay. The property was described anew in this judgment and it was set forth that it was bounded on the West by Margarita Brook which separated it from lands of the Iriarte brothers, "and by the mangrove lands of The People of Puerto Rico lying between Río Nuevo and the present bed of the Margarita Brook." The line to be laid out to which reference is made in the judgment appears on a blueprint set up in December 1940 by engineer Carlos Castro Martínez, and that line is the western boundary and part of the northern boundary which, as stated in the judgment, separated the Monte Rey property from all the land belonging to The People of Puerto Rico.[2]

---

[1] In its first judgment the court held that the San Patricio property had an original area of only 760 cuerdas according to the dominion title proceeding, and thus determined that the remainder retained after the segregation and sold to Lloréns was only 80, but this was not altogether correct since, according to the survey made subsequent to the proceeding, the property had an area of 900 recorded cuerdas. This explains the position subsequently assumed by The People in the transaction. If no error had been committed in the claim in the amount of 300 cuerdas, we doubt whether the former Attorney General would have disposed of lands in the action by The People of Puerto Rico without legislative authorization, or of his superior, the Governor.

[2] Taking as a basis the Verraco Brook at the furthest end of the property, which is its boundary with the segregated lands of Rubert,

8) Lloréns lost the entire Monte Rey property as a result of a foreclosed mortgage debt, and afterwards recovered some portions of the property under a compromise made in an action brought by him for annulment of the foreclosure. Since the disposition of the case does not call for it, it is not necessary to describe in detail the portions recovered nor many other transactions made by Luis Lloréns-Torres and later by his heirs respecting the Monte Rey property and which caused its dismemberment. The trial court made a careful and elaborate exposition of all those facts and transactions, division and subdivision of the property which is in accord with the evidence, to which we refer as well as to a certificate of the Registry of Property, Section Two of San Juan, of December 15, 1958, which was admitted in evidence. So far the facts preceding the suit.

9) On March 18, 1952, the Ramos-Buist brothers and sisters, Antonia through her assignee, Raúl Ramos Mimoso, and the other three through their heirs, sued the heirs of Luis Lloréns-Torres in the San Juan Part of the Superior Court in an action which they entitled Declaration of Community of Property, Survey, Division of Common Ownership, and Claim for Fruits and Damages. The Ramos-Buist brothers and sisters alleged in the first cause of action that from the total of 220 cuerdas which composed the property sold to Lloréns, 137 cuerdas were mangrove lands situated within the limits set forth in the private agreement of October 29, 1919, and the remainder (83) was dry land which was not involved in the litigation between The People and Lloréns-Torres; that the judgment of February 18, 1931, adjudged to Lloréns the full dominion of the entire property

the Monte Rey property lies rather in a southeast-northwest direction, as it appears both from Nin's blueprint of March 1920 and Castro-Martínez's blueprint of 1940. Hence, the fact that the northern boundary mentioned in the different instruments was in part the western boundary, and that the western boundary was also in the direction of the Bay of San Juan, as well as part of the northern boundary.

sold having an area of 220 cuerdas; that by virtue of that judgment and the stipulations of the private agreement of October 29, 1919, the Ramos brothers and sisters became owners, jointly and undividedly with Lloréns, of five-sixths of one-half of the 137 cuerdas, the other sixth corresponding to Manuel F. Rossy under the said private agreement. That the community having been established, Lloréns-Torres continued in possession of those lands in the name and representation of all its members. That neither Lloréns nor his heirs had performed the agreement, which instrument, according to information and belief, was in possession of Rossy, deceased August 6, 1932, had been misplaced, and it was not until January 22, 1952, that the original was found among the papers left by Rossy.

10) In a second alternative cause of action plaintiffs alleged that the intention had been to sell to Lloréns only the dry and solid lands of the property, and that the 137 cuerdas of mangrove land were conveyed to him as beneficiary or trustee for his own benefit and on behalf of plaintiff's predecessors, and in order that Lloréns, who was a lawyer and an influential person, could assume the defense of the property right over the mangrove lands in litigation with The People of Puerto Rico; and that the stipulations of the private agreement of October 29, 1919, were but a means to compensate Lloréns-Torres for his services, recognizing to him one-half of the mangrove land, and likewise to compensate Rossy for his professional services in assisting to quiet the right and title of plaintiffs' predecessors to those lands. They also alleged that the selling price agreed upon in the deed covered only the dry or solid lands of the rural property; that the consideration for the conveyance of the mangrove land was the value of the professional services as to one-half of those lands, "the other half remaining always the property and under full dominion of plaintiffs' predecessors."

11) In a third cause of action plaintiffs alleged that there were 40.827 cuerdas of mangrove land held in possession by defendant heirs, and that since one-half of 137 cuerdas (68.50) corresponded to them and to Rossy, Lloréns had disposed of the difference, 27.673 cuerdas, belonging to plaintiffs, the latter having claimed their cash value in the sum of $138,365.

12) In a fourth cause of action plaintiffs alleged that the mangrove lands claimed were adjacent to portions of dry land owned by defendants, and prayed for a judicial survey in order to determine the exact area as well as the location of the mangrove lands claimed.

13) On September 29, 1952, Manuel H. Rossy appeared in the action as sole heir and successor of Manuel F. Rossy, and filed a third-party complaint against the heirs of Lloréns claiming one-sixth of one-half of the 137 cuerdas. The third-party complaint contains the same allegations made by the plaintiffs, heirs of the Ramos-Buist brothers and sisters.

14) The defendants interposed defense of prescription against the complaint and the third-party complaint filed by Rossy. The defense was dismissed as to the original complaint. Subsequently another magistrate sustained the same as to the first, third and fourth causes of action of Rossy's third-party complaint. That magistrate also eliminated the essential allegations of the second alternative cause of action. This Court reviewed said judgment in certiorari—*Rossy* v. *Superior Court*, 80 P.R.R. 705 (1958)—and held that the second cause of action had also prescribed. Intervener's all four causes of action were thus held to have prescribed. The reasoning of this Court was that the case involved personal actions which prescribed after 15 years, in this case, as of February 18, 1931, on which date the plaintiffs, Ramos as well as Rossy, could have asserted their right under the private agreement of October 29, 1919. On the other hand, this Court did not uphold the elimination of the allegations

of the second alternative cause of action, but it made a pronouncement that the averments eliminated in the sense that "the consideration of the conveyance of the mangrove lands to Lloréns by virtue of that deed was the value of his professional services as attorney as to one-half of those mangrove lands, *the other half remaining always the property and full dominion of the Ramos-Buist brothers*," would correspond only to the Ramos-Buist brothers who were the owners of the property before the contract of sale was executed, and not to Rossy. 80 P.R.R. at 727.

15) On November 8, 1957, plaintiffs Ramos filed an amended supplementary complaint substantially embodying the same averments and prayer, added a cause of action against Felipe Segarra to annul the transactions carried out by the latter and by the heirs of Lloréns subsequent to the original complaint and which they alleged were made in common concert for the purpose of prejudicing their rights, and increased the cash value of the mangrove lands claimed and sold from $138,365 to $553,460.

16) The mandate having been received in the Superior Court on October 7, 1958 in the *Rossy* case, plaintiffs and the intervener immediately amended their complaints in order to allege acts which interrupted the extinctive prescription.[3]

17) Defendants denied all of the basic and essential facts of the complaints, reproduced their defenses of extinctive prescription and alleged acquisitive prescription in their favor, both ordinary and extraordinary. The case went to trial on a stipulation of the parties not to litigate the cause

---

[3] Our decision in Rossy's certiorari completely disposed of his action, holding that it had absolutely prescribed and indirectly left standing the action of the Ramos only as to the averment in the second alternative cause of action of revendicatory type, to the effect that they were the owners of one-half of the mangrove land claimed at the time of making the agreement. As a result of those amendments on the interruption of prescription, it may be explained that both the Ramos' action and Rossy's could be litigated on the merits in all of their causes of action, notwithstanding the holding of this Court at that stage of the proceedings.

of action relative to the judicial survey, nor those averments relative to the number of cuerdas of mangrove land claimed which the plaintiffs and the intervener alleged had been sold and their cash value, nor to those that remained in possession of defendants.

The case having been heard, the issue in controversy in itself was submitted solely on the basis of documentary evidence, since the plaintiffs' and the intervener's oral evidence was confined to acts aimed at interrupting the prescription and to explain how the original of the agreement of October 29, 1919, was found. On the basis of the evidence, the trial court in its conclusions dismissed the theory of the constitution of a trust in connection with the mangrove lands claimed, and rejected the averment that plaintiffs had only sold to Lloréns the dry lands of the property and not the mangrove lands. Said the court: "Plaintiffs' allegation, to which the first intervener subscribes, does not deserve serious consideration, to the effect that the sale to Lloréns-Torres of the Monte Rey property by the Ramos-Buist brothers, executed before Notary Luis Abella-Blanco, comprised only the dry lands thereof, that is, that the sale did not include the mangrove lands in litigation, in which case the action exercised would be an action of revendication which would not have prescribed by the lapse of 15 years. There is nothing in the deed of sale or in the conduct of the parties to warrant such a conclusion. The deed is clear and explicit to the effect that by virtue thereof the Monte Rey property *of about two hundred twenty cuerdas of flat, swampy and mangrove land is sold.*'" (Italics in the original.) Further on it said: "The averment of the second alternative cause of action of the complaint of the case and of the third-party complaint that the mangrove lands of Monte Rey property were conveyed to Lloréns-Torres as beneficiary or trustee, for his own benefit and for the benefit of the parties to the agreement of October 29, 1919, should be rejected . . . . There is nothing

in deed No. 42 of October 29, 1919 which may be interpreted as establishing or constituting such trust. And it is clear that the private instrument of like date, apart from the fact that it is silent on the creation of a trust, would not be the proper instrument for so doing." The foregoing conclusions, which dispose of the second alternative cause of action of revendicatory nature, are fully supported by the record and are accepted as correct.[4] The first ground of the challenge of the judgment alleged in this appeal is thus disposed of.

Regarding the first cause of action, the trial court concluded that as of February 18, 1931, Lloréns was bound by the private agreement to convey to the Ramos-Buist brothers and sisters and to Rossy one-half of 123 cuerdas. It substantiated its conclusion as follows: "The actual result of the claim of The People of Puerto Rico, as compromised, was that The People of Puerto Rico recovered 177 cuerdas of

---

[4] In the deed of division made between the Ramos and Rubert one month prior to the execution of the deed of sale to Lloréns, the 680 cuerdas of Rubert are described as flat, semiflat, swampy and mangrove lands, and the 220 cuerdas of Monte Rey as flat, swampy and mangrove; and it appears from that document, a fact which is verified in the blueprints, that the mangrove lands did not form a single, separate, unitary body, but that there were mangrove lands jointly with dry lands sparsed throughout the San Patricio property. The land of both portions was similar. Rubert's part was assessed at the rate of $44.11½ per cuerda, and the Monte Rey parcel a value of $9,800 already agreed upon for the conveyance to Lloréns. Lloréns' price per cuerda was assessed at $44.54½, and since he purchased for $10,000 in all, he paid them at $45.45, slightly more than the price assessed to Rubert. This is explained by the fact that the 220 cuerdas were flat and plain, while those of Rubert were semiflat and hilly. This fact confirms that Lloréns paid for all the 220 cuerdas acquired by him in a genuine transaction and for the usual and common price, not at an artificial or fictitious price reduced for the purposes of other reserves or intentions of the parties. At the time of acquiring them, Lloréns constituted a mortgage in favor of a third person on the whole Monte Rey property for $7,000, part of the purchase price of $10,000 which he paid in the notary's presence. During his whole life Lloréns performed acts of strict dominion on the totality of the Monte Rey property and not on only part thereof.

mangrove land out of the total of 300 cuerdas claimed in its complaint, and Lloréns Torres retained 123 cuerdas of mangrove land which, together with the 97 cuerdas of dry land under the stipulation of August 5, 1924, make up the recorded 220 cuerdas of the Monte Rey property purchased from the Ramos-Buist brothers and sisters."

■■ We have made a careful study of the entire documentary evidence, including the disclosures of the judicial records and the blueprints, and in the light of that evidence containing the facts preceding the transactions of October 29 which do not appear in the latter and coetaneous facts immediately following, as a whole, and in the light of all the circumstances present, it does not appear, with that degree of persuasion legally required to establish a fact, that as a result of the claim of The People, Lloréns was bound to convey to plaintiffs one-half of 123 cuerdas or any other amount of land, pursuant to the covenant in the said private agreement. We shall explain our conclusion based on evidence which, being only documentary, we can weigh as well as did the court of first instance.

The People of Puerto Rico was the owner, by cession of the Spanish Crown and later of the Congress of the United States, of 1003.61 cuerdas of mangrove land lying at the bottom of the San Juan Bay in the jurisdiction of Cataño, Guaynabo and Río Piedras, bounded on the north by the bay. By proclamation of May 28, 1918, of Governor Yager, Administrative Bulletin No. 143, said mangrove land was declared an insular forest under Act No. 22 of November 22, 1917 (Sp. Sess. Laws, p. 242), which established the Forest Service, was placed under the immediate care and conservation of the then Commissioner of Agriculture and Labor, and the cutting of trees and lumber for charcoal or for any other purpose was prohibited.

Jointly with the filing of the complaint on April 16, 1920, The People of Puerto Rico filed a petition for injunction

against Lloréns, alleging that the parcel object of the action, of approximately 300 cuerdas or more *accessible to the high tides*, was an integral part of the 1003.61 cuerdas of mangrove land; that that parcel had been placed under the supervision, care and administration of the Forest Service Bureau which was taking care thereof and giving the service required by law and for the purposes thereof until one of the days of the *month of January 1920* when Lloréns took possession of the said parcel, thereby depriving The People of its parcel, and started to cut mangrove, to make charcoal, dig ditches, and to perform other works which destroyed the trees, and of plowing and cultivation. The injunction was issued the same day, directing Lloréns to refrain from further performance of such acts until the action was definitively decided.

Llorens' position was that the San Patricio property consisted of 1077 cuerdas instead of 900; that Monte Rey, his property, included the said additional 177 cuerdas, that is, 397 cuerdas, according to the blueprint which he attached to the answer of the suit, and in which engineer Nin said that he made a survey "following the boundaries indicated by Lloréns." He stated under oath in the answer that the 150 cuerdas were dry and good lands on the south and east, 120 cuerdas were swampy and partly mangrove land on the northern part accessible to the extravasations of the river since the San Juan aqueduct was built, and the remaining 130 cuerdas on the eastern part were "marshy," miry, and "accessible to the maritime extravasations and filtrations in extraordinary tides" which went up the Puerto Nuevo River and other channels of the bay.[5]

---

[5] They sum up to 400 instead of 397. It may be observed that the description of the land of 270 cuerdas is very similar to the description of the land of 220 cuerdas, which indicates that the 130 cuerdas of "swampy" or marshy land subject to the filtrations of the tides, a fact which is not mentioned in the description of the property of 220 cuerdas,

There is no doubt that the action arose as a result of Lloréns' acts already described, performed on a property which was under the immediate care and supervision of the Forest Service. The controversy actually hinged on the demarcation, on the western boundary, of the parcel claimed and the property of Lloréns, on the basis of the survey of the maritime zone and the title to the portion of the "marshy" or lands flooded by the filtrations and extravasated water of the sea with the rising of the tide. In finding that the parcel claimed was part of the 1003.61 cuerdas of mangrove land and concluding at law that the dividing line between both properties was the highest line marked by the water of the rising and receding tide, the District Court held, citing § 339 of the Spanish Civil Code and *People* v. *Dimas*, 18 P.R.R. 1019, that Lloréns' title "did not comprise" the portion of land in litigation and sustained the complaint.[6]

The final judgment adjudged to Lloréns, as third party, the 220 cuerdas acquired by him under the protection of the

---

were part of the 177 additional cuerdas claimed by Lloréns; that this additional area extended to the west toward the bay and the mangrove land of 1003.61 cuerdas, and that about 47 cuerdas of the 177 cuerdas could be part of the 270 cuerdas.

[6] The complaint does not describe by its metes and bounds the parcel of approximately 300 cuerdas. The 1003.61 cuerdas were not recorded either. In its judgment the court did not fix physically on the land the highest place reached by the waters. Assuming that Lloréns had only acquired 80 cuerdas on the basis of the recorded original area of San Patricio property (neither 220 nor 397), it seemed "more logical to the court *to attribute* that increase" of 317 cuerdas to the illegal appropriation of the 300 cuerdas claimed. As we observed on a previous occasion, the court did not take into consideration the recorded area of 900 cuerdas of the San Patricio property, but rather 760, nor that of Monte Rey of 220 cuerdas, but rather 80, which greater areas, as set forth by the parties in the deed of division of September 27, 1919, were the result of a survey made "by competent surveyors geometricians with proper instruments." If the court had considered the recorded area of 220 cuerdas, the illegal appropriation which it *attributed* to Lloréns would have been 177 instead of 300, which coincides with the unrecorded additional area which Lloréns attributed to his property.

Registry. This rather indicates, in the light of the facts and circumstances stated, that Lloréns did not prevail in asserting his theory of the 177 additional cuerdas, with much more certainty and logic than if Lloréns would have defeated a claim by The People within the area of those 220 cuerdas. The judgment also fixed the western boundary between the 220 cuerdas and the lands of The People, the other boundaries remaining the same.

A survey having been made, as stipulated, starting from Verraco Brook, at the furthest end of the property and dividing the remainder of Rubert by the east and southeast, in a westerly direction as far as a line running from north to south parallel to the insular highway, it cannot be determined from the record whether in laying out the dividing line the engineers of the Department of the Interior crossed or not the highest line marked by the rising and receding tide waters, and, hence, it cannot be determined from the record whether at the time of fixing the dividing line Lloréns obtained for his benefit, as part of the 220 actual cuerdas, any portion of the mangrove land claimed.

Notwithstanding the assertions made by the Ramos on the correctness and accuracy of the area of 220 cuerdas and appearing a month before in the deed of division, in all probability, and the trial court so understood, they and Lloréns were thinking of the questionable additional area of 117 cuerdas upon executing the deed of sale and the instrument of October 29, 1919, and perhaps they already contemplated it in July when they were considering a compromise. Unfortunately this suit is instituted 32 years after those transactions when the direct convenanters were already dead and could not testify, and when, by reason of multiple transactions and dismemberments of the property and filling and other works performed by third acquirers, it was difficult to establish the physical identification of any portion of land object of this litigation with the property the parties had in

mind, either for its recovery in estate or to obtain the value thereof in substitution.[7] The physical identification of such land with the property in its present characteristics was neither alleged nor litigated before the trial court, and, as we stated before, in the San Patricio property there were sparsed mangrove together with dry lands.

For more uncertainty, neither the instrument of July 27, 1919, nor the subsequent instrument of October 29, nor the deed of division of September 27, the three instruments which make reference to the mangrove land in question, set forth its extent or area, nor determined the same by its metes and bounds. In that of July 27 it is said that "Messrs. Lloréns and Rossy would procure from the Insular Administration the obtainment of the mangrove lands lying on the northeastern part of the property *bounded by the sea*, and the amount of land *obtained thereby* shall be divided between the vendee and the vendors." We do not know whether they had in mind, but it is probable by the terms employed which we have italicized, the 177 additional cuerdas which Lloréns claimed were part of Monte Rey. It is also probable that between July 27 and October 29 Lloréns *took steps*, unsuccessfully, with the Insular Administration, wherefore on October 29 reference is made to a "piece" of mangrove land, lying on the northern part of the property, "which The People of Puerto Rico *seeks* to claim without reason from him (from Lloréns)." Unfortunately, we say again, the contracting parties were not living so that they could offer us their intention. Further on in this instrument it is said that the land is enclosed within a perimeter which is described as having

---

[7] According to plaintiffs' evidence, prior to 1931, the date of the judgment, the Ramos had in their possession, and Dr. Rafael Ramos-Mimoso, who took the main steps to claim it from Lloréns, already had it in 1931, a literal copy of the private instrument of October 29, including the notarial attestation and the number of the affidavit, which copy could be easily identified with the original apparently lost and found in 1952.

such broad boundaries in the blueprint that the "piece" would be equivalent to the greater part of the property. The deed of division does not even mention a place.

In view of all the facts stated, a stipulation made by the parties in the suit brought by The People, based on the metes and bounds indicated in the blueprint prepared by Lloréns, to the effect that of the 397 cuerdas The People only claimed the 300 cuerdas of *miry* land described in the complaint, leaving out of the action the remaining 97 cuerdas situated in the dry or southern part, bounded on the north and west by the miry lands claimed—which stipulation did not serve as a basis for the judgment rendered—does not establish by itself, as do the other facts, that Lloréns obtained 123 cuerdas from The People and that they were those pointed out by the contracting parties with the obligation to divide them between themselves. If the suit had been litigated against an area of 220 cuerdas, it would be more probable that Lloréns would have succeeded in obtaining some land from The People if he had recorded its area. It having been litigated on the basis of 397 cuerdas, it was shown instead that he could not establish the additional area of 177 cuerdas, according to the description which he made under oath in his answer.

Lastly, although Lloréns purchased for a lump sum, which is common, in view of the entries in the record and his conduct after the acquisition, we do not believe that he paid for 220 cuerdas at the normal price knowing that he was only obtaining 80, a difference of almost two-thirds, plus the obligation to litigate for the remainder of the acquisition and to divide the product if he should prevail. It seems more reasonable that, in view of the possibility or expectancy that Monte Rey should have 397 cuerdas instead of 220, the parties had in mind the distribution of any excess over 220 which Lloréns should obtain against The People, considering further that the limit of the public mangrove land in con-

nection with the property would present a debatable question of statutory construction in the light of the Law of Waters and Ports.

Notwithstanding its conclusion on Lloréns' obligation, the trial court concluded that the actions had prescribed and rendered judgment dismissing the complaints. The personal character of these causes of action, which prescribe after 15 years, was already determined by this Court in certiorari, *Rossy* v. *Superior Court, supra.* In view of our conclusions, we need not discuss whether or not it was error to eliminate the oral evidence tending to establish acts which interrupt the prescription.

The judgment will be affirmed as to the plaintiffs, heirs of the Ramos-Buist. The judgment as to plaintiff Rossy became final and unappealable upon failure to appeal therefrom to this Court. This opinion disposes likewise of petition No. 289 interposed by defendants, heirs of Lloréns.